UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

**FILED**

00 MAR 13 PM 3:32

U.S. DISTRICT COURT
N.D. OF ALABAMA

CHRIS DAVIS,                          )
                                      )
        Plaintiff,                    )
                                      )
vs.                                   ) Civil Action No. CV-98-S-2600-S
                                      )
CENTER POINT FIRE DISTRICT;           )
FIRE CHIEF PAUL HUNNICUTT, in         )
his official and individual          )
capacity; and DEPUTY CHIEF            )
HOWARD SUMMERFORD, in his             )
official and individual              )
capacity,                            )
                                      )
        Defendants.                   )

**ENTERED**

MAR 13 2000

## MEMORANDUM OPINION

Plaintiff, Chris Davis, was employed as a firefighter in the community of Center Point, Alabama. His employment was terminated on October 22, 1997, by defendants Paul Hunnicutt, the Center Point Fire Chief, and Howard Summerford, the Deputy Fire Chief.

Thereafter, plaintiff filed a complaint in the Circuit Court of Jefferson County, Alabama on September 11, 1998, alleging that his termination violated the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution, and, the Employee Polygraph Protection Act ("EPPA"), 29 U.S.C. § 2001, et seq. He also asserted various state law claims, including defamation, slander, and invasion of privacy. Defendants removed plaintiff's action to this court on October 13,

1998, asserting original subject matter jurisdiction over plaintiff's federal claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367(a).

This action is before the court on defendants' motion for summary judgment (doc. no. 18). For the reasons set forth below, the court finds that defendants' motion is due to be granted in part.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. ..." (Emphasis added.) The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The moving party discharges this burden by "showing" or

2

"pointing out" to the court that there is an absence of evidence to support the non-moving party's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995)*(per curiam)*. Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d at 593.

In deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or

3

conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. See Augusta Iron & Steel Works v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Jeffery, 64 F.3d at 594 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52, 106 S.Ct. at 2512.

With the foregoing standards in mind, the following facts either are not disputed, or are stated in a light most favorable to plaintiff.

## II.   FACTUAL BACKGROUND

Plaintiff was hired as a firefighter by the Center Point Fire Department in September of 1994.[1]  He was the acting officer in

---

[1] Plaintiff's deposition at 130.

4

charge of Station 5 on October 12, 1997, because his immediate supervisor, Captain Gene Coleman, was working at a different station that day. Plaintiff was working the day shift, which began at 8:00 a.m., with three other firefighters: Randy Wright, Scott Phillips, and Scott Henderson.[2]

On the day in question, Henderson arrived early, around 7:30 a.m., but informed plaintiff that he was sick and wanted to return home.[3]    Henderson could not leave, however, until plaintiff arranged for another firefighter to complete Henderson's shift.[4] Therefore, plaintiff went to the station's office and telephoned Alan Durham, who was scheduled to work the evening shift, and he agreed to replace Henderson.[5]

While plaintiff was calling Durham, Henderson went into one of the two bedrooms located in the station ("bedroom A"), and placed his duffle bag on top of one of the beds.[6]  He removed a "fanny pack" from his waist, placed it on top of the duffle bag, and walked into the bathroom where he showered.[7]  Inside Henderson's

---

[2] *Id.* at 159.
[3] *Id.* at 159; Henderson's deposition at 51.
[4] Henderson's deposition at 31.
[5] Plaintiff's deposition at 159.
[6] Henderson's deposition at 54.
[7] *Id.* at 51-52.

5

fanny pack was a money clip containing at least four $100 bills.[8] Henderson contends the only time his things were unattended was while he was in the shower.[9]

The two other firefighters on duty that morning, Scott Phillips and Randy Wright, were outside the station, working on the fire truck, ensuring that it contained necessary supplies.[10] According to plaintiff, Phillips walked into the station and through the office while Henderson was showering, but Phillips remained inside only briefly.[11] In contrast with plaintiff's account, Phillips contends he never entered the station while Henderson was in the shower.[12]

In any event, plaintiff walked outside and advised Phillips and Wright that Durham had agreed to replace Henderson.[13] While they were discussing the change in personnel, Butch Hardin, a local Sunday school teacher, arrived to lead the firemen in their weekly church service.[14] Plaintiff, Phillips, Wright, and Hardin retired to the kitchen table and began their service.[15]

---

[8] *Id.* at 25.

[9] *Id.* at 52

[10] Plaintiff's deposition at 160.

[11] *Id.* at 160-162.

[12] *Id.* at 161, and exhibit 17 b.

[13] *Id.* at 173.

[14] *Id.* at 175.

[15] *Id.* at 176.

6

Approximately twenty minutes later, Durham arrived, walked to the bedroom at the back of the station, and returned to announce that Henderson was asleep.[16]    Plaintiff told Durham to wake Henderson, and "[t]ell him he can leave."[17]    Durham did so, and Henderson gathered his things, put his fanny pack on, left the station, and returned home.[18]

At the conclusion of the service, plaintiff went into the second of the two bedrooms ("bedroom B") and retrieved his money, because he was going to the grocery store to purchase food for lunch.[19] Plaintiff noticed that he was missing approximately forty dollars and "questioned ... Scott Phillips and Randy Wright if they had noticed it or seen it anywhere maybe laying around."[20]   They denied that they had seen plaintiff's money, so plaintiff "dismissed it and ... left" for the store.[21]

When plaintiff returned from the grocery store, he went into the kitchen to prepare lunch.[22]   While he was in the kitchen, Henderson entered the station and accused plaintiff of stealing $100 from his

---

[16] *Id.*

[17] *Id.*

[18] Henderson's deposition at 52.

[19] Plaintiff's deposition at 178.

[20] *Id.*

[21] *Id.* at 179.

[22] *Id.* at 184.

7

money clip. Henderson contends that he first discovered the missing money when he arrived home.

> After I had went home on sick leave and sitting at the kitchen table with my fiancé at the time, I give [sic] her some money for paying some bills and to go to the store to give [sic] me some medication.

> When I pulled the money out of the money clip — actually I pulled the money from my bag, and the money just fell out of the money clip and the money clip was bent open, approximately, about an inch or an inch-and-a-half. [21]

Plaintiff contends that Henderson confronted him about the missing money, and then began to search plaintiff's personal belongings.

> A.    Sometime later the kitchen door flies open.  Scott Henderson said he needed to talk to me.
>
> . . .
>
> Q.    Was he mad?
>
> A.    Yes, ma'am.
>
> . . .
>
> A.    [B]y the time I put down the things I was cooking with and got around the corner he was still here near the shower — near the bathroom.... And he said something to the effect, don't lie to me. I know you took my f'ing money. And I didn't know what he was talking about. I said, what are you talking about. I don't know anything, what you're talking about. He pulled out a money clip and he said, I had money in my money clip and you stole it. I want you to tell me now that you did it. And [he] just started ranting and raving.
>
> . . .
>
> Q.    What did you say?
>
> A.    I told him I didn't know what he was talking about. He started raising a little more cane. I turned

---

[21] Henderson's deposition at 26.

8

around.   At this time I had moved my bag from ...
bedroom [B] over to ... bedroom [A]....

. . .

Q.     After you and [Henderson] met in the hall and talked
       ... what happened next?

A.     Scott turned around, walked ... into ... bedroom [A]
       ... [p]icked up my back.  Dumped it out.   Laid it
       back down.  The things that didn't come out he took
       out and threw them aside, threw them beside the bed
       on the floor....

Q.     What did you do?

A.     I just stood there.   I just told him I didn't know
       anything about what he was talking about and if he
       needed to search my items he could do it, you know,
       in a different fashion.

Q.     Meaning?

A.     Meaning, don't just throw them out everywhere, you
       know.  I didn't have nothing to hide so I didn't care
       if he looked in it. [24]

Henderson  then  began  "pulling  things  out  of  [plaintiff's]

locker."[25]      Henderson  admits  that  he  searched  plaintiff's

belongings, but he was unable to locate the missing money.

I was pretty hot and mad anyway.  I mean, I proceeded to
look through the bedroom that he was in, which there's three
beds in that bedroom, turned the mattresses upside down,
looked up under the lockers, behind the doors, and then I
went through my room, and I looked through it three times.
I looked through it twice by myself.   And by that time,
Captain Coleman had gotten there, and he had looked through
it again with me, behind the doors, up under the lockers,

---

[24] *Id.* at 185-85, 186-190.

[25] *Id.* at 191.

9

under the bed.[26]

Because Henderson was so upset about the missing money, Captain Coleman reminded him that "he was off on sick time" and told him that he needed to leave the station.[27]  Plaintiff gave Coleman permission to search his personal belongings, including his truck, because he "had nothing to hide and knew nothing about [Henderson's] money."[28]  Coleman again advised Henderson to leave the station, and Henderson complied.[29]  Coleman then gathered the remaining employees at the station and asked them to "sit down and briefly write up the day's events."[30]

Coleman eventually left the station to meet with his immediate supervisor, defendant Howard Summerford, and report Henderson's theft allegations.[31]  Specifically, Coleman informed Summerford of what had occurred, and asked Summerford for guidance on how to proceed:

> Captain Coleman said that he had interviewed all people present, everybody agreed that the only people in that area of the building was Scott Henderson and Chris Davis at the time the money ... came up missing.  The money clip was sprung apart, had been pried open.  It wouldn't hold money

---

[26] Henderson's deposition at 29.

[27] Plaintiff's deposition at 192.

[28] Id. at 192-93.

[29] Id. at 193.

[30] Id. at 194.

[31] Summerford's deposition at 23.

10

anymore.

> He and other employees had searched the area that the money
> came up missing in and nobody found anything, he said that
> ... several people had done a thorough search, there was no
> money to be found anywhere; said that Scott Henderson had
> accused Chris Davis or he believed that Chris Davis had
> taken the money. [32]

Summerford instructed Coleman to contact the Jefferson County
Sheriff's Department, so that an official police report and
criminal investigation could be completed.[33] Summerford, in turn,
relayed the information to his immediate supervisor, defendant
Hunnicutt, who concurred with Summerford's instructions to
Coleman.[34]

Later in the evening, plaintiff called Captain Coleman and asked
him to return to the station, because he had learned that Henderson
was "calling personnel at home and calling personnel at other
stations more or less already convicting me of" stealing his
money.[35] Coleman did return to the station, and after talking
briefly with plaintiff outside, he walked into the station to
retrieve some of his personal items.[36] Plaintiff followed Coleman

---

[32] *Id.* at 25.

[33] *Id.* at 28.

[34] *Id.*

[35] Plaintiff's deposition at 227.

[36] *Id.* at 243-44.

11

inside, and went into bedroom A to play video games with Durham.[37]

When plaintiff entered the bedroom, Durham was already there

watching television.[38]

> I go in the station. Me and Alan Durham was going to go to
> the back bedroom, play the Playstation game. I closed the
> door. I believe I received a phone call. Got on the phone
> and remembered — I don't know what it was I was going to
> discuss with Captain Coleman.
> . . .
> On the way out I noticed money sitting [behind the door].
> At this time the door had been closed.[39]

The money hidden behind the door was a $100 bill that was "folded

one time" and "laying down flat" between "the door facing and the

lockers."[40]  Durham also saw the money, because plaintiff told him

to look.

A.    [I] [m]ade a comment that prompted him to sit up and
      look. Actually, I pointed it out to him.  I [said]
      something to the effect of, you know, what is this.
      Alan sat up, looked, come to the end of the bed.   I
      picked it up.  Said, it's a hundred dollar bill.

Q.    What did Alan say?

A.    Pretty much, all this shit for nothing.[41]

Plaintiff then put the money back behind the door, and notified

Captain Coleman that he had found Henderson's missing $100.

---

[37] *Id.* at 245.
[38] *Id.* at 254.
[39] *Id.* at 245-247.
[40] *Id.* at 247-48.
[41] *Id.* at 248-49.

12

Coleman followed plaintiff into the bedroom, retrieved the money, and said that he would notify Henderson that the money had been located.[42]

Coleman contacted Summerford and the Sheriff's Department and reported that the money had been located.[43] As a result of this information, the Sheriff's Department closed their criminal investigation.[44] Summerford, however, refused to close the fire department's internal investigation.

> [Coleman] told me that the money was found behind a door in a place that would have been very unlikely that the money would have fallen and landed had it fallen out of somebody's pocket or been dropped. It was highly unlikely that it would be found there.
>
> He also informed me that Chris Davis is the one that found the money.[45] And I told him that we were still going to

---

[42] *Id.* at 249-50, 253.

[43] Summerford's deposition at 29-30.

[44] Hunnicutt's deposition at exhibit 19.

[45] Moreover, plaintiff admitted to Coleman that he was the only person who had access to the money while Henderson was in the shower.

> Q.    Isn't it true that when Captain Coleman and Summerford and Chief asked you if you were the only one with access you said, yes that's true? You said that, didn't you?
>
> A.    Yes, ma'am.  I believe I did. ...
>
> Q.    Okay. ...  It was — you were the only one that had access during the alleged time frame which was when Scott Henderson —
>
> A.    While he was in the shower.
>
> Q.    — was in the shower, right?

13

> conduct the investigation; [sic] that it my mind this
> doesn't change the fact that it appears that a theft has
> occurred, and we were going to continue the
> investigation. [46]

Henderson also expressed a desire to continue the internal
investigation, despite the fact that his money had been located.[47]

The next evening, on October 13, 1997, Hunnicutt met with Barry
Hodgens, the Center Point Fire Commissioner, and Steven Ball, their
attorney, to discuss a possible resolution of the theft
investigation.

> Well, we had two conflicting stories. We had several pieces
> of evidence. We didn't know which way to go on, as far as
> — actually, it was two people with conflicting stories, and
> we wanted to have some other tool to help us solve the
> overall case.... [48]

Hunnicutt proposed administering a polygraph examination to both
plaintiff and Henderson, and Hodgens and Ball accepted his
proposal.[49]

On October 15, 1997, Coleman, Summerford, and Hunnicutt

---

A.    Yes, ma'am.

Q.    And that was conveyed to Chief and Summerford and Captain
      Coleman, correct?

A.    Correct.

Plaintiff's deposition at 202-03.

   [46] Summerford's deposition at 29-30.
   [47] Henderson's deposition at 22-24.
   [48] Hunnicutt's deposition at 73.
   [49] *Id.* at 72-73.

14

separately asked both plaintiff and Henderson to submit to a polygraph examination.[50]   Both plaintiff and Henderson agreed to take the exam, and the exams were scheduled for the following afternoon.[51]   On the morning of October 16th, however, plaintiff asked for a written explanation of why he was being asked to take the test, and that the exam be postponed for forty-eight hours so that he could consult with an attorney.[52]   Plaintiff's polygraph was rescheduled for October 21, 1997, and Hunnicutt and Summerford prepared a written explanation as to why he was asked to submit to a polygraph exam.

Later that same afternoon, Hunnicut and Summerford met with plaintiff and provided him a copy of their written justification for the polygraph request.[53]   Plaintiff was asked to sign his copy,

---

[50] Plaintiff's deposition at 258; Henderson's deposition at 32.

[51] Id.

[52] Plaintiff's deposition at 283; Summerford's deposition at 52.

[53] That written explanation provided, in pertinent part:

1.   Incident or activity being investigated.

   A.   Description of incident or activity: Theft from employee

. . .

4.   Basis of Employer's reasonable suspicion that Employee was involved in the incident or activity under investigation:

   A.   Information from a co-worker or other individual: Employee was missing a 100 dollar bill from his fanny pack after taking a shower.

   B.   Employee's behavior, demeanor or conduct: Chris Davis

15

acknowledging that he had received it, but he refused to do so.[54]

Plaintiff also stated that he felt entitled to refuse to take the

polygraph exam because defendants were merely requesting, not

requiring him to take the test:

> I asked if I was being required or if I had to take the
> polygraph test or if they were just suggesting or requesting
> me to take the polygraph test. And they said that they
> requested me to and I read where it says you are requested
> to appear. I felt that that entitled me to refuse it, that
> I was — it wasn't commanding me to do or demanding me to,
> so I felt at that time that I could refuse the polygraph
> test. So again, I made the statement about I was being
> requested and refused and Chief Hunnicutt marked it out, put
> required and said now you're required and signed it. [55]

Plaintiff also alleges that Summerford threatened to fire him if he

refused to take the examination.[56] Hunnicutt then placed plaintiff

on paid administrative leave, and notified him of this decision in

---

> was the only person with access during the time the
> money came up missing.   After all employees were
> informed that a full investigation would be conducted.
> Chris Davis found a $100 dollar bill behind a door on
> the floor.

> C.   Inconsistencies between facts, claims or statements that
> surfaced during the investigation: The victim states he
> saw the money in his fanny pack before he entered the
> shower.   It was in a money clip with other bills.[]

Hunnicutt's deposition at exhibit 22; see also Summerford's deposition at 102;
plaintiff's deposition at 283-84.

[54] Plaintiff's deposition at 288.

[55] Id. at 296-97; but see Hunnicutt's deposition at 103 (testifying that
plaintiff agreed to take the polygraph test if Hunnicutt would change the word
"requested" to the word "required").

[56] Plaintiff's deposition at 310-311.

16

writing.[57]

On the morning of October 21, 1997, plaintiff refused to take
the polygraph examination.[58]   Hunnicutt and Summerford requested
that plaintiff put his refusal in writing and, accordingly,
plaintiff submitted the following written statement:

> I Chris L. Davis on this day October 21, 1997 at 08:30 am
> refusing to take a polygraph test Concerning [sic] an
> investigation of theft of property from Mr. Scott Henderson.
> This decision was solely made by me with the advise [sic] of
> my legal representation.   I feel that this test is
> inaccurate And [sic] should not be administered in order to
> judge a persons honesty or charicter [sic].[59]

After plaintiff submitted this document, the meeting was adjourned

and plaintiff left the station.

Later that same day, plaintiff received a page that directed him

to report to defendant Hunnicutt's office.[60]

> Chief Hunnicutt and Chief Summerford was there.  And I stood
> there and Chief Summerford said that they'd looked into the
> matter and don't know what else to do and said, so I guess
> — here, I'll just let you read it and handed me my
> termination letter.[61]

The letter stated that his "employment with the Center Point Fire

District is terminated effective October 22, 1997 at 8:00 AM."[62]

---

[57] *Id.* at 302 and exhibit 15.

[58] *Id.* at 314.

[59] *Id.* at exhibit 17-A.

[60] *Id.* at 308.

[61] *Id.*

[62] *Id.* at exhibit 9.

17

Summerford and Hunnicutt had received prior permission from Fire

Commissioner Hodgens to terminate plaintiff's employment.[63]

Later in the day, plaintiff called to inquire if there was

anything he could do to rectify the situation.

> After I returned or went to my home, spoke to my fiancé
> about the situation, didn't have any idea about what to do
> about it. So some time went by and I called to speak with
> Chief Hunnicutt that day, the 21st. Chief Summerford
> answered the phone instead, and I asked him if there was
> anything I could do, if we could meet again, if perhaps we
> could meet....
> ...
> Chief Summerford come back and said Chief Hunnicut said
> we've done all we can do for you.[64]

Plaintiff then called Sue Duke, the President of the Board of

Directors for the Center Point Fire District.[65] According to

plaintiff, Duke did not have any independent knowledge of his

situation, but she assured him that she would investigate and "get

back" with him.[66] Plaintiff never spoke with Duke again, although

he called her numerous times after their initial telephone

conversation.[67]

Plaintiff obtained legal representation following his

termination, and his attorney drafted a letter to the Board of

---

[63] Hunnicutt's deposition at 67-68; Summerford's deposition at 114.

[64] Plaintiff's deposition at 316-17.

[65] *Id.* at 49.

[66] *Id.*

[67] *Id.* at 49-50.

18

Trustees for the Center Point Fire District.[68] The letter was dated

December 17, 1997, and stated in pertinent part:

> It has come to our attention that Mr. Davis was told by the
> Chief that he was terminated. Mr. Davis has asked the Board
> for a review of this matter as he contests the termination.
> It was not proper, and there was no basis for said
> termination. Even though Mr. Davis has made a verbal
> request, this should serve as a formal request that the
> Board meet to discuss this issue.[69]

Steven Ball, legal counsel for the Center Point Fire District,

responded by letter dated January 13, 1997.[70] That letter read, in

its entirety:

> On January 12, 1998, I had an opportunity to meet with the
> Board of Directors for the Center Point Fire District along
> with the Fire Chief, after our regularly scheduled monthly
> meeting. Additionally, since we have last spoken, I have
> had an opportunity to speak with the Fire Chief and those
> involved in the investigation of the circumstances
> surrounding the termination of Chris Davis on October 22,
> 1997.
>
> After review of the facts, it is the Board's position that
> the termination of your client was proper. Further, as an
> employee's request for a review of his dismissal by the
> Appeal Board must be presented, in writing, within seven (7)
> days of the Fire Chief's approval of the dismissal, the time
> to apply for that administrative remedy has expired.[71]

Plaintiff claims that he had no knowledge before his termination

---

[68] *Id.* at exhibit 20.

[69] *Id.*

[70] *Id.* at exhibit 4.

[71] *Id.*

19

of the Fire District's grievance procedure.[72]  He alleges that he

received an unaddressed, hand-delivered copy of the procedures in

his mailbox following his termination.[73]  Hunnicutt admits that

copies of the grievance procedures are not given to employees

during their employment; rather, employees "are told of the rule

book and notified that they are to read the rule books when they're

hired."[74]  Plaintiff contends that he tried to get a copy of the

grievance procedures, but one was not made available to him.

> Q.   Let's be sure we're on the same page.  It was your
>      understanding there was not a book, a written thing
>      for you to review, or there were no rules at all?
>
> A.   No, I knew there were rules.  It was my understanding
>      that there was not a copy of the rule book that I
>      could actually get for myself and review.
>
> Q.   And who did you get that understanding from.
>
> A.   Probably several people.  I know Lieutenant King.
>
> Q.   What did Lieutenant King tell you that left you with
>      that impression?
>
> A.   Well, he was my previous supervisor on another shift
>      and as a lieutenant if he didn't have access to a
>      copy I, you know—
>
> Q.   Well, I guess my question was more what did he say to
>      you so far as having access to the book — or the
>      rules?  I'm sorry.

---

[72] *Id.* at 25-28, 323.

[73] *Id.* at 81-83, 322

[74] Hunnicutt's deposition at 42-43.

20

A.    That they didn't have one.

Q.    So Lieutenant—

A.    That he did not have one that I could review, that
      the department did not have one that I could review.
      And that there may be one floating in existence
      somewhere, one.

. . .

Q.    You never followed up and asked anyone else about it,
      that one that was floating around?

A.    They didn't want to make it available.

Q.    Who didn't want to make it available?

A.    Lee Gaither. [75]

. . .

Q.    How did you learn that?

A.    He told me. [76]

### III.  DISCUSSION

Defendants move for summary judgment on all claims asserted by
plaintiff based on Eleventh Amendment and qualified immunity
grounds, as well as pleading and evidentiary insufficiencies.

### A. Eleventh Amendment Immunity

The Center Point Fire District argues that it is an arm of the
State of Alabama, and the Eleventh Amendment bars plaintiff's
claims against it. [77]  Defendants Hunnicutt and Summerford likewise

---

[75] According to plaintiff, Lee Gaither was the only employee of the fire
district who actually had a copy of the rules. *See* Plaintiff's deposition at 66.

[76] *Id.* at 69-72.

[77] To the extent that defendants claim that are entitled to sovereign

21

contend that the Eleventh Amendment bars any claims asserted against them in the official capacities of Chief and Deputy Chief, respectively.

In support of these arguments, defendants contend that the Center Point Fire District was established in 1968, by an election of citizens residing within the Center Point community, and by a subsequent order from the probate judge of Jefferson County, Alabama. Defendants have attached a copy of the order, entered on November 8, 1968, and it provides:

It appearing to the Court that a special election was held on Tuesday, November 5, 1968, under the provisions of Act No. 79 of the Special Session of the Legislature of Alabama of 1966, as amended, by Acts No. 488 and 702 of the Regular Session of the Legislature of Alabama of 1967, and September 8th, 1967 respectively, to establish a district for maintaining a system for fighting or preventing fires, and whether a proposed service charge for the maintenance of the district shall be levied and collected in an area known as Center Point Fire area, and:

The undersigned Judge of Probate of Jefferson County, Alabama having canvassed the returns from said election as

---

immunity, they are in error. The Eleventh Circuit has explained the differences between sovereign and Eleventh Amendment immunity as follows:

"[T]he Eleventh Amendment deals only with federal jurisdiction to hear suits against the state, not with the state's immunity from suit in any forum." The Eleventh Amendment insulates states from "private parties seeking to impose a liability [in federal court] which must be paid from public funds in the state treasury...." State sovereign immunity, on the other hand, serves to insulate states from lawsuits in their own courts.

*Hufford v. Rodgers*, 912 F.2d 1338, 1340-41 (11th Cir. 1990) (internal citations omitted).

22

made by the inspectors and determined that 1,561 votes were cast to "establish the system" and that 1,197 votes were cast to "establish the service charge" and 751 votes were cast against "establishing the system" and 897 votes were cast against "establishing the service charge".

NOW, THEREFORE, it is ORDERED, ADJUDGED AND DECREED that the Center Point Fire District be and it is hereby established and it is further ORDERED, ADJUDGED AND DECREED that the Center Point Fire District Service Charge be and it is hereby established, and that all costs and expense incident to said election are taxed against Jefferson County, Alabama, to be paid from the General Fund. [78]

The Eleventh Amendment bars suit in federal court against states and their officials. *See Summit Medical Associates, P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999). That amendment provides:

The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U. S. Const. amend. XI. The amendment has been interpreted to prohibit not only suits against a state by citizens of another state, but also suits against a state initiated by that state's own citizens. *Summit*, 180 F.3d at 1336 (citing *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Hans v. Louisiana*, 134 U.S. 1, 18-19, 10 S.Ct. 504, 508, 33 L.Ed. 842 (1890)). The amendment does not extend, however, to counties, municipal corporations, or other political subdivisions of the

---

[78] Plaintiff's exhibit 6.

state. *Mt. Healthy Board of Education v. Doyle*, 429 U.S. 274, 280,
97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977).

Moreover, state officials sued in their official capacity are
also protected by the amendment, as long as the state is, in fact,
the real party in interest. *See Pennhurst State School & Hospital
v. Halderman*, 465 U.S. 89, 101, 104 S.Ct. 900, 908, 79 L.Ed.2d 67
(1984). "The general rule is that a suit is against the sovereign
if the judgment sought would expend itself on the public treasury
or domain, or interfere with the public administration, or if the
effect of the judgment would be to restrain the Government from
acting, or compel it to act." *Id.* at 101 n.11, 104 S.Ct. at 908
n.11 (internal quotation and citation omitted).

The issue presented, therefore, is whether the Center Point Fire
District is classified as an "arm of the State" or, as a "municipal
corporation or other political subdivision." *Mt. Healthy,* 429 U.S.
At 280, 97 S.Ct. at 572. Although this question is one of federal
law, the court must examine the fire district's function and
character as established by state law in order to determine whether
the fire district is an arm of the state and, thus, protected by
the Eleventh Amendment. *Stewart v. Baldwin County Board of
Education,* 908 F.2d 1499, 1509 (11th Cir. 1990) (internal citations

24

omitted).   Such an analysis turns on consideration of three

factors: "(1) how the state law defines the entity; (2) the degree

of state control over the entity; and (3) the entity's fiscal

autonomy —— where the entity derives its funds and who is

responsible for judgments against the entity."   *Id.; see also*

*Robinson v. Georgia Department of Transportation*, 966 F.2d 637, 638

(11th Cir. 1992).

The Center Point Fire District was established pursuant to Act

No. 79 of the 1966 Alabama Legislature.   That Act provides, in

pertinent part:

> Section 1.   This Act shall apply to Jefferson County,
> Alabama, and to no other County.
> . . .
> Section 8.  Where an election is held on the question of the
> establishment of a district, <u>the governing body of the
> County shall pay for the necessary expense of advertising
> and conducting such election out of the general funds of the
> County</u>;  provided,  however,  that  if  the  district  is
> established, the district shall reimburse the County for the
> expenses incurred by the County in respect to said election.
> . . .
> Section 9.  No district shall be created unless the creation
> thereof is approved by the majority of votes case at the
> election at which the proposed creation is submitted.  Upon
> the  officers  canvassing  the  returns  of  the  election
> certifying that the creation of the district was approved by
> the  majority  of  the  votes  cast  at  such  election,  the
> proposed district shall be created and <u>shall constitute a
> public corporation</u>.
>
> Section 10.  The affairs and business of the district shall
> be managed by a Board of Trustees consisting of five members

appointed by the governing body of the County. ...

Act No. 66-79 (emphasis supplied).   This act was a local law,
applying only to Jefferson County, Alabama, *see City of Adamsville
v. City of Birmingham*, 495 So. 2d 642, 644 (Ala. 1986), and was but
one of a series of local acts providing for the establishment of
similar fire districts throughout the individual counties in
Alabama.    *See e.g.*, Alabama Constitutional Amendments No 378
(Madison), No. 379 (Montgomery), No. 381 (Russell), No. 392 (Lee),
No. 432 (Etowah).

There can be no doubt that the Center Point Fire District is a
public corporation under the plain language of Act No 66-79, and
the Order from the Probate Judge of Jefferson County, establishing
the Fire District pursuant to that act.  Moreover, defendants have
provided the court with copies of Center Point's original articles
of incorporation, filed on May 2, 1966, which also support their
assertion.  *See* plaintiff's deposition at exhibit 14.

Defendants contend, however, that the designation of the Center
Point Fire District as a public corporation is determinative of
whether such entity is deemed an "arm of the state."  In support of
this argument, defendants rely on the following excerpt from *Armory
Commission of Alabama v. Staudt*, 388 So. 2d 991 (Ala. 1980).

26

> The power of the State to create a body corporate as its
> agent to carry on certain special kinds of work for its
> benefit or for the public interest can not be doubted.  And
> where this power is exercised, the institution thus
> established is in every sense a State institution, and
> belongs to the State, although managed and its affairs
> administered under the supervision of trustees of the body
> corporate created for that purpose....  And where (the
> corporations) are created, who has the property interest in
> these institutions?  Clearly the State.  In the exercise of
> its right of sovereignty it established them for public
> purposes; it donates the property or the funds to purchase
> it upon which they are built, supplies the means by which
> they are maintained and operated.  They have no capital
> stock, or shares held by individuals.  Indeed, they have no
> membership or stockholders.  They are not created for
> profit, but solely as public benefactors, the beneficiaries
> being the people who compose the State.

*Staudt*, 388 So. 2d at 992-993 (quoting *White v. Alabama Insane
Hospital*, 138 Ala. 479, 482, 35 So. 454, 454 (1903)).

This court, however, is unpersuaded that Center Point's public
corporation status is conclusive of its Eleventh Amendment
analysis.  Although the court has considered the aforementioned
language from *Staudt*, the court finds that such precedent is
distinguishable for several reasons.

First, in holding that the Armory Commission of Alabama was an
arm of the state, the *Staudt* court observed that "[w]ithout doubt,
a judgment against the Armory Commission would adversely affect the
state treasury."  *Id.* at 993.  The court reasoned:

A judgment in favor of [plaintiff] would directly diminish

27

amounts appropriated to the Commission, and, should the
Commission appropriation become insufficient, the governor
may find it necessary to supplement the Commission
appropriation with funds from the general military
appropriation.

*Id.* Here, however, defendants have not proven that a similar
result would occur in the present case.[79]   Indeed, the evidence
before the court illustrates that Center Point is a financially
independent entity, separate and apart from the State of Alabama.
In the first instance, Amendment No. 314 to the Alabama
Constitution provides that fire-fighting districts are funded
"exclusively by the proceeds of a service charge."

> The expenses of establishing and maintaining any such fire-
> fighting and fire prevention system or any such garbage
> collection and disposal system in a district, as the case
> may be, shall be paid for exclusively by the proceeds of a
> service charge, which shall be levied and collected in an
> amount sufficient to pay the said expenses.
>
> Said service charges shall be levied upon and collected
> from the persons and property to whom and to which such
> services are available; and the service charge shall be a
> lien upon any such property.

Alabama Constitutional Amendment No. 314 (1971).   Moreover, in
establishing the Center Point Fire District, it was Jefferson
County, not the State of Alabama, which funded the initial
election. *See* Act No. 66-79 at § 8.   Finally, it also appears that

_____

[79] Although defendants argue that a similar result would occur in the
present case, they have provided no affidavits or any other evidence to support
their arguments. *See* defendant's (doc. no. 25) brief at 5.

the State of Alabama exercises very little, if any, control over the Center Point Fire District. The affairs and business of the district are managed by an independent Board of Trustees, and pursuant to Act No. 66-79, the original members of that board were "appointed by the governing body of the County," not the State.

Therefore, this court concludes that defendants have failed to prove that the Center Point Fire District is an arm of the State of Alabama and, thus, they are not entitled to the protection of the Eleventh Amendment. Such a decision is supported by the lack of state control over the Fire District and the Fire District's fiscal autonomy. "A public corporation is a separate entity from a county, city, or town, and is not a subdivision of the state." *Dobbs v. Shelby County Economic and Industrial Development Authority*, Nos. 1970932, 1971026, 1999 WL 1001221, at *4 (Ala. Nov. 5, 1999); *see also Opinion of Justices*, 294 Ala. 571, 319 So. 2d 699 (1975) (quoting Alabama Constitutional Amendment No. 109 (1953)).

**B. Plaintiff's Claims under 42 U.S.C. § 1983**

Plaintiff alleges two claims under the purview of Section 1983. First, he contends that defendants "unequally applied the law and local rules of the Center Point Fire Department" in violation of

29

the Equal Protection Clause of the Fourteenth Amendment.[80]  Second,

plaintiff contends that defendants "failed to offer and/or refused

Plaintiff the opportunity to pursue the Center Point Fire

District's 'GRIEVANCE AND APPEAL PROCEDURES,' in clear violation of

the Due Process clause of the Fourteenth Amendment of the United

States Constitution."[81]  Defendants argue that both claims should

be dismissed due to pleading deficiencies.  Specifically,

defendants contend that plaintiff has failed to allege that they

acted under color of state law, as required by section 1983.

Section 1983 creates a private right of action for damages and

injunctive relief against individuals and governmental entities

whose conduct under color of state law deprives a plaintiff of

rights, privileges, or immunities secured by the United States

Constitution or federal statutes.[82]  Two allegations are required

to state a claim under 42 U.S.C. § 1983.  "First, the Plaintiff

---

[80] Plaintiff's complaint ¶ 16.

[81] Id. ¶ 30.

[82] 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation,
custom, or usage of any State or Territory or the District of
Columbia, subjects, or causes to be subjected, any citizen of the
United States or other person within the jurisdiction thereof to the
deprivation of any rights, privileges, or immunities secured by the
Constitution and laws, shall be liable to the party injured in an
action at law, suit in equity, or other proper proceeding for
redress.  For the purposes of this section, any Act of Congress
applicable exclusively to the District of Columbia shall be
considered to be a statute of the District of Columbia.

30

must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law." *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980); *see also Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir. 1995). "When Congress enacted § 1983 as the statutory remedy for violations of the Constitution, it specified that the conduct at issue must have occurred 'under color of' state law; thus liability attaches only to those wrongdoers who carry a badge of authority of a State and represent it in some capacity...." *NCAA v. Tarkanian*, 488 U.S. 179, 191, 109 S.Ct. 454, 461-62, 102 L.Ed.2d 469 (1988).

A person acts under color of state law when he acts with authority possessed by virtue of his employment with the state. *See Edwards*, 49 F.3d at 1522 (citing *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988)). "[S]tate employment is generally sufficient to render the defendant a state actor." *West*, 487 U.S. at 49, 108 S.Ct. at 2255. "The dispositive issue is whether the official was acting pursuant to the power he/she possessed by state authority or acting only as a private individual." *Edwards*, 49 F.3d at 1523.

31

The problem with plaintiff's complaint is that it fails to
contain any state action allegations. Plaintiff has maintained
throughout this lawsuit that the Center Point Fire District was "a
<u>private</u> corporation under contract with the community of Center
Point, Alabama." At no point in plaintiff's complaint, or in his
submittals in opposition to summary judgment, did he allege that
defendants acted under color of state law.[83] If plaintiff intended
the contract between Center Point Fire District and the community

---

[83] Throughout plaintiff's response in opposition to the motion for summary
judgment, he maintains that the Center Point Fire District is a private, not a
state entity. Instead of directly addressing defendants' arguments with regard
to his pleading deficiency, he attempts to shift the blame to defendants:

> Defendants' allege sovereign immunity, contending they are state
> actors, and next argues as a defense that Plaintiff has failed to
> assert that the Defendants are [state] actors. At the time
> Plaintiff filed his Complaint in state court, Plaintiff was unaware
> of how the Center Point Fire District had been established. Rather
> than move to dismiss Plaintiff's federal claims, the Defendants
> removed this action due to Plaintiff's federal claims brought
> pursuant to 42 U.S.C. § 1983. The Defendants then answered by
> pleading that the Center Point Fire District was a "local
> governmental agency." As stated above, the Defendants have yet to
> reveal whether the Center Point Fire District is a private entity,
> a municipal entity, or an entity of the State of Alabama. If indeed
> the Center Point Fire Department is a state entity, its officers,
> individually, can be held liable for violation of federal law.

Plaintiff's brief (doc. no. 28) at 15. Plaintiff, however, entirely misses the
point. Even if plaintiff had been correct in his assertion that the Center Point
Fire District was a private corporation, he still must allege and prove some
element of state action in order to utilize the vehicle of 42 U.S.C. § 1983. See
e.g., Brentwood Academy v. Tennessee Secondary School Athletic Association, 180
F.3d 758, 762 (6th Cir. 1999) (detailing the contours of the state action
doctrine with respect to nominally private parties). At the time defendants
answered plaintiff's complaint and asserted that they were a "local governmental
agency," plaintiff should have moved to amend his complaint to adjust his factual
allegations. Because he failed to do so, his section 1983 claims are due to be
dismissed.

of Center Point, Alabama to create the necessary state action, he should have said so. Even under a liberal construction, plaintiff's allegations fail to meet the pleading requirements for stating a cause of action under section 1983. Accordingly, these claims are due to be dismissed.

**C. Plaintiff's Claims Under 42 U.S.C. § 1985**

Plaintiff's complaint does not contain a separate count devoted solely to his conspiracy claims. Rather, plaintiff has scattered these allegations throughout his complaint, stating in each separate count that "[p]laintiff avers that the Defendants, individually and in conspiracy together" acted in violation of state and federal law. Defendants move for summary judgment as to these claims on the grounds that plaintiff has failed to plead the requisite class allegations.

At the outset, the court notes that plaintiff does not identify which, if any,[14] of the three subsections of section 1985 is the basis for his conspiracy claims.[15] The court presumes for the sake

---

[14] The court also notes that Alabama law recognizes a cause of action for civil conspiracy. *See e.g., McLemore v. Ford Motor Company*, 628 So. 2d 548 (Ala. 1993) (discussing the elements of such a claim).

[15] The first subsection of § 1983 proscribes interference with the performance of a federal officer's official duties. *See* 42 U.S.C. § 1985(1). The second addresses conspiracies to obstruct justice through the intimidation of parties, witnesses or jurors in judicial proceedings. *See* 42 U.S.C. § 1985(2). As discussed in the text following this note, the third subsection prohibits agreements to deprive persons of their civil rights. *See* 42 U.S.C. § 1985(3).

33

of this discussion, however, that plaintiff intended to invoke

section 1985(3), because that subsection creates a cause of action

for conspiracies which deprive persons of the equal protection of

the law or other federal rights, privileges, or immunities.[86]

Section 1985(3) originally was enacted as part of the Ku Klux

Klan Act of 1871, and "in response to widespread violence and acts

of terror directed at blacks and their supporters in the postwar

South." *Harrison v. KVAT Food Management, Inc.*, 766 F.2d 155, 157

(4th Cir. 1985) (citation omitted). Section 1985(3) does not

provide any "substantial rights itself," but rather "[t]he rights,

---

[86] 42 U.S.C. § 1985(3) provides, in its entirety:

If two or more persons in any State or Territory conspire or
go in disguise on the highway or on the premises of another, for the
purpose of depriving, either directly or indirectly, any person or
class of persons of the equal protection of the laws, or of equal
privileges and immunities under the laws; or for the purpose of
preventing or hindering the constituted authorities of any State or
Territory from giving or securing to all persons within such State
or Territory the equal protection of the laws; or if two or more
persons conspire to prevent by force, intimidation, or threat, any
citizen who is lawfully entitled to vote, from giving his support or
advocacy in a legal manner, toward or in favor of the election of
any lawfully qualified person as an elector for President or Vice
President, or as a Member of Congress of the United States; or to
injure any citizen in person or property on account of such support
or advocacy; in any case of conspiracy set forth in this section,
if one or more persons engaged therein do, or cause to be done, any
act in furtherance of the object of such conspiracy, whereby another
is injured in his person or property, or deprived of having and
exercising any right or privilege of a citizen of the United States,
the party so injured or deprived may have an action for the recovery
of damages occasioned by such injury or deprivation, against any one
or more of the conspirators.

34

privileges, and immunities that § 1985(3) vindicates must be found

elsewhere...." *United Brotherhood of Carpenters & Joiners v.*

*Scott*, 463 U.S. 825, 833, 103 S.Ct. 3352, 3358, 77 L.Ed.2d 1049

(1983).

To establish a claim under section 1985(3), a plaintiff must

prove four elements: "(1) a conspiracy; (2) for the purpose of

depriving, either directly or indirectly, any person or class of

persons of the equal protection of the laws, or of equal privileges

and immunities under the laws; and (3) an act in furtherance of

the conspiracy; (4) whereby a person is either injured in his

person or property or deprived of any right or privilege of a

citizen of the United States." *Scott*, 463 U.S. at 828-29, 103

S.Ct. at 3356. These elements may be established by circumstantial

evidence, and do not require proof equivalent to a smoking gun.

*Burrell v. Board of Trustees of Georgia Military College*, 970 F.2d

785, 793 (11th Cir. 1992). The issue in the present case, as in

many cases under § 1985(3), is whether plaintiff has satisfied the

second element.

In construing this requirement, the Supreme Court has determined

that "the conspiracy not only must have as its purpose the

deprivation of 'equal protection of the laws, or of equal

35

privileges and immunities under the laws,' but also must be motivated by 'some racial, or perhaps otherwise class-based, invidiously discrimi-natory animus behind the conspirators' action.'" *Scott*, 463 U.S. at 829, 103 S.Ct. at 3356 (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971) (emphasis supplied)). Although the Court has held that the statute does not include "conspiracies motivated by bias towards others on account of their economic views, status, or activities," *Scott*, 463 U.S. at 837, 103 S.Ct. at 3361, the Court declined to decide "whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable...." *Griffin*, 403 U.S. at 102 n.9, 91 S.Ct. at 1798 n. 9 (emphasis supplied).

The Court cautioned against a broad interpretation of § 1985(3), warning that the statute was not intended to act as "a general federal tort law" that would "apply to all tortious, conspiratorial interferences with the rights of others." *Id.* at 101-02, 91 S.Ct. at 1798. The Court stated:

> In the first place, it is a close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause, most notably Republicans. The central theme of the bill's proponents was that the Klan and other were forcibly resisting efforts to emancipate Negroes and give them equal

36

access to political power.  The predominant purpose of §
1985(3) was to combat the prevalent animus against Negroes
and their supporters.  The latter included Republicans
generally, as well as others, such as Northerners who came
with sympathetic views towards the Negro.

*Scott*, 463 U.S. at 836, 103 S.Ct. at 3360.

Here, plaintiff's complaint fails to contain any allegations of

racial animus.  Moreover, plaintiff's complaint fails to contain

any class allegations whatsoever.

> The notion of a cognizable class includes two separate and
> distinct components.  The first component focuses on the
> substantive characteristic defining the class, e.g., race or
> gender or political affiliation. ...  <u>The second component,
> by contrast, focuses not on the particular defining
> characteristic of the putative class, but on whether there
> is any identifiable class at all</u>. ...  <u>No matter what the
> alleged basis for discrimination, the allegation of a
> "class-based animus" naturally presumes that there is a
> specific, identifiable class against whom the defendants
> have discriminated</u>. ...  Though there is no comprehensive
> set of rules for determining when individuals constitute a
> class for purposes of § 1985(3), there are certain
> inescapable minimum requirements.  For instance, it is clear
> that at the very least a class must be more than just a
> group of persons who bear the brunt of the same allegedly
> tortious behavior.

*Aulson v. Blanchard*, 83 F.3d 1, 5 (1st Cir. 1996) (emphasis

supplied).  As Justice Scalia has explained:

> Whatever may be the precise meaning of a "class" for
> purposes of *Griffin's* speculative extension of § 1985(3)
> beyond race, the term unquestionably connotes something more
> than a group of individuals who share a desire to engage in
> conduct that the § 1985(3) defendant disfavors.  Otherwise,
> innumerable tort plaintiffs would be able to assert causes

37

> of action under § 1985(3) by simply defining the aggrieved
> class as those seeking to engage in the activity the
> defendant has interfered with.

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269, 113

S.Ct. 753, 759, 122 L.Ed.2d 34 (1993).

Plaintiff does not clearly define <u>any</u> distinct and identifiable

class. He neither identifies which "law[s] and local rules of the

Center Point Fire Department" were applied unequally, nor

identifies any other firefighters who were retained in spite of

refusing to take a polygraph. Rather, plaintiff seeks only to

recover for harm that he personally suffered. Such allegations are

insufficient to warrant protection under § 1985(3). *See Rodgers v.*

*Tolson*, 582 F.2d 315, 318 (4th Cir. 1978) (rejecting alleged class

partly because it was "impossible to determine who besides the

[plaintiffs] belong to this class," and because plaintiffs had

failed to identify "a larger group that could be objectively

identified by an observer"); *Bricker v. Crane*, 468 F.2d 1228, 1233

(1st Cir. 1972) (noting that a class must be "readily recognizable"

in order to come within the scope of § 1985(3)). Accordingly,

plaintiff's § 1985 claim is due to be dismissed.

## D. **Plaintiff's Polygraph Protection Act Claim**

In count two of plaintiff's complaint, he contends that

38

"Defendants ... wrongfully required Plaintiff to submit to a Polygraph test in clear violation of the Polygraph Protection Act of 1988."[87] Specifically, plaintiff argues that he was fired from his position, because he refused to take the polygraph required by defendants.[88]

Although defendants dispute plaintiff's conclusion that he was fired for refusing to take the polygraph, they contend that such motivation, even if accepted as true, does not subject them to liability under the act. Rather, defendants contend that several exemptions contained within the act serve to absolve them of liability. They invoke both the governmental employers exception, and, the exception for ongoing investigations. Because the court agrees that defendants fall within the first exception, it declines to discuss their remaining arguments.

"Congress enacted the Employee Polygraph Protection Act in 1988 in response to justified concerns that employers were many times misusing lie detectors or their derivatives ... and were too frequently relying on inaccurate, inconclusive, or unfounded lie

---

[87] Plaintiff's complaint ¶ 20.

[88] In plaintiff's brief in opposition to defendants' motion for summary judgment, he contends for the first time that defendants' conduct also violates Alabama Code § 36-1-8 (1975), and that such a claim is not preempted by the EPPA. The problem with plaintiff's argument, however, is that he failed to allege this claim in his complaint. Therefore, he is prohibited from relying on this statute to avoid summary judgment.

39

detector results to make employment decisions." *Veazey v. Communications & Cable of Chicago, Inc.*, 194 F.3d 850, 858 (7th Cir. 1999). Generally, the EPPA makes it unlawful for private employers to condition employment on the passage of a lie detector test. Section 2002 of the EPPA states, in pertinent part:

> Except as provided in sections 2006 and 2007 of this title, it shall be unlawful for any employer engaged in or affecting commerce ...
>
> > (1) directly or indirectly, to require, request, suggest or cause any employee ... to take or submit to any lie detector test;
>
> ...
>
> > (3) to discharge, discipline, discriminate against in any manner, or deny employment or promotion to, or threaten to take any such action against —
>
> > > (A) any employee or prospective employee who refuses, declines, or fails to take or submit to any lie detector test....

29 U.S.C. § 2002. The EPPA defines the term "lie detector" to include "a polygraph, deceptograph, voice stress analyzer, psychological stress evaluator, or any other similar device (whether mechanical or electrical) that is used, or the results of which are used, for the purpose of rendering a diagnostic opinion regarding the honesty or dishonesty of an individual." 29 U.S.C. § 2001(3).

These prohibitions, however, are subject to a number of

40

exceptions that significantly limit the applicability of the EPPA.

The one applicable to the present discussion, section 2006(a),

creates an exception for governmental employers:

> This chapter shall not apply with respect to the United
> States Government, any State or local government, <u>or any</u>
> <u>political subdivision of a State or local government</u>.

29 U.S.C. § 2006(a) (emphasis supplied).  Although the EPPA does

not define the term "political subdivision," the regulations

promulgated by the Department of Labor define the term as follows:

> The term any political subdivision of a State or local
> government means any entity which is either:
>
> (1) Created directly by a state or local government, or
>
> (2) Administered by individuals who are responsible to
> public officials (i.e., appointed by an elected public
> official(s) and/or subject to removal procedures for public
> officials, or to the general electorate).

29 C.F.R. § 801.10(c).

The Eighth Circuit recently determined that a hospital,

established by a county pursuant to a Missouri statute, qualified

as a political subdivision of the county and, thus, was exempt from

the provisions of the EPPA.  *See Hossaini v. Western Missouri*

*Medical Center*, 140 F.3d 1140, 1141 (8th Cir. 1998).  The hospital

was established by the county commission, although it was "managed

by a board of trustees, the individual members of which are elected

by the citizens of Johnson County." *Id.* The board of trustees delegated the daily operational and managerial duties to the hospital's president, who was appointed by the board of trustees. *Id.* In holding that the hospital qualified as a political subdivision under the EPPA, the court rationalized:

> Under this definition, a county need not be involved in the day-to-day operations of a hospital or derive revenue from such operations in order for the hospital to be considered a "political subdivision" of the county. All that is necessary is that the hospital be created by a state or local government or administered by individuals who are responsible to public officials.
>
> Under either of these criteria, the hospital is clearly a political subdivision of Johnson County. [The hospital] was created by the county pursuant to [a Missouri statute]. In addition, [the hospital's] administration is appointed by public officials, the board of trustees.

*Id.* at 1144.

The Center Point Fire District was also created by a county, Jefferson County, pursuant to Act 66-79 of the Alabama Legislature. This act, similar to the one at issue in *Hossaini*, granted county officials the authority to appoint the original members of the board of trustees. It also obligated the county to finance the initial election, whereby the voters contained within Center Point's district were provided with an opportunity to support or reject its establishment. Although the county is no longer

42

involved in the day-to-day operations of the Fire District, such a consideration is immaterial under the Eighth Circuit's holding in *Hossaini*. Accordingly, the court concludes that the Center Point Fire District, and the remaining defendants as employees of the District, are exempt from the EPPA.

## E. Plaintiff's State Law Claims

Having dismissed all of plaintiff's federal claims, the court declines to exercise supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. §§ 1367 (c)(1), (c)(3). A resolution of the these claims will necessarily involve consideration of state sovereign immunity, under Article I, § 14 of the Alabama Constitution, and are better left to the Alabama courts.[69]  Because this case was removed by defendants from the Circuit Court of Jefferson County, Alabama, the remaining state law claims will be remanded to the original forum for all further proceedings.

## IV.  CONCLUSION

An order consistent with this memorandum opinion will be entered contemporaneously herewith.

---

[69] This court's Eleventh Amendment analysis is a separate and distinct analysis from the concept of sovereign immunity under Alabama law. *Hufford v. Rodgers*, 912 F.2d 1338, 1340 (11th Cir. 1990).

43

**DONE** this _13th_ day of March, 2000.

_____
United States District Judge

44